Christopher WILLIAMS, Plaintiff,

v.

KRUG LINCOLN–MERCURY,
Defendant.

No. 92–76330.

United States District Court,
E.D. Michigan, S.D.

April 7, 1994.

Christopher Williams, in pro per.

Kevin L. Moffatt, Mt. Clemens, MI, for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court, after trial to the bench. Plaintiff, Christopher Williams, an African American man, initially filed this case, *in pro per*, alleging disparate treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 *et seq.* ("Title VII"). Plaintiff was granted court-appointed counsel and his attorney obtained leave to amend his complaint, adding an Elliott–Larsen count, requesting a jury and seeking compensatory damages. After a significant breakdown in attorney-client relations, Plaintiff's attorney withdrew and Plaintiff was left, *in pro per* again, to conduct a jury trial. Accordingly, at the beginning of trial, on February 24, 1994, this Court dismissed the Elliott–Larsen claim *sua sponte*, for the reason that it would not have granted leave to amend in the first instance had it known Plaintiff would be compelled, because of the amendment, to represent himself in a jury trial.

Initially, this Court also heard the Equal Employment Opportunity Commission's ("EEOC") renewed motion to quash the subpoena of EEOC investigator Linda Sankovich. This Court granted the motion to quash. Defense counsel had taken Ms. Sankovich's deposition on November 18, 1993, and Plaintiff had the opportunity to cross-examine her at that time. Accordingly, this Court determined that defense counsel could utilize Sankovich's deposition at trial because of her unavailability, and granted the motion to quash subpoena.

Plaintiff was hired by the Defendant, Krug–Lincoln–Mercury, Inc., (hereinafter "Krug"), as a body shop helper on July 29, 1991. Plaintiff's position differed from that of a full-fledged body shop technician because a technician is certified with the State of Michigan to repair collision damage including metal outer panels, frames and welding.

On the other hand, Plaintiff's position as a body shop helper involved doing minor assembly and disassembly of vehicles, such as removing and installing grills and bumpers.

Plaintiff was hired to replace Robert Marlatt, who was employed by the Defendant as an assembler, a position comparable to Plaintiff's body shop helper position. Marlatt, who is white, was paid at a rate of $5.00 per hour, whereas Plaintiff's initial starting salary was $6.00 per hour. Christopher Diroff, the body shop manager at Defendant Krug, testified that Plaintiff was essentially hired to replace Marlatt, as Marlatt was not able to perform all of the functions of an assembler and was unavailable for full time work. On the basis of recommendations by Robert Elliott, Defendant Krug's production manager, and Joseph Hershey of Bill Wink Chevrolet, where Plaintiff had been previously employed as a painter's helper, Diroff interviewed and then hired Plaintiff.

Defendant Krug is an automobile dealership located in Dearborn, Michigan. It is also a motor vehicle repair facility licensed as such by the Michigan Department of State. To perform major vehicular repairs in Michigan, a repair facility is required by the State of Michigan to be certified and to have a license to do that type of work. Also, all persons permitted by the facility to do collision-repair work must be state-certified, as well. In compliance with this state regulation, it is the Defendant's policy to employ only state-certified persons, possessing state certificates, as body-shop technicians. Otherwise, Defendant Krug would lose its state certification as a facility.

Defendant's licensed body shop technicians were compensated solely by commission, at a rate of 47% of all of billable work performed. Time slips recorded the type of work performed, hours expended, cost of the work performed, and were used for commission calculation as well. A copy of each job time slip was retained by each body shop technician for his personal record, and as only body shop technicians were compensated through commissions, only they would generate job slips. Body shop helpers and assemblers, on the other hand, were paid an hourly wage, regardless of work performed. Helpers and/or assemblers, such as Plaintiff, had no license from the state to perform the work which was billable to customers as the work of a certified technician.

Plaintiff contends that the Defendants initiated a special program to compensate him with a 47% commission in addition to his hourly wage. The refusal to pay this double compensation is what he cites as race discrimination in this suit. However, Plaintiff was an unlicensed body shop helper. As employees performing collision-related work must be state-certified, and Defendant credibly demonstrated every effort at full compliance with that requirement, this Court cannot credit Plaintiff's testimony that he accepted the hourly job "only for a few days, to demonstrate what I can do". Nor can this Court accept Plaintiff's contention that Defendant agreed to put him on a 47% commission basis, *in addition to his hourly pay,* soon after his arrival at the facility. He had arrived, moreover, from a position as a painter's helper.

Plaintiff offered state-certified documents demonstrating that, during his tenure, at least two of Defendant's body shop technicians did not have active state certificates. They included Leroy Ali, Defendant's top body shop technician, who is presently certified, but had no active certificate between the dates of October 12, 1982 and December 2, 1991; also Robert R. Higgs, was not certified until April 27, 1992, according to state records. It is noteworthy that the chief technician, Ali, whom Plaintiff appears to claim was more favorably treated, was also black.

Also, Body Shop Manager Diroff testified that Plaintiff's ultimate replacement, Larry Smouthers, was hired to begin at an hourly wage of $9.00 because he was state-certified, whereupon Plaintiff offered another record bearing the Michigan seal, indicating that Larry Smouthers had not been state-certified in a motor vehicle specialty or as a master mechanic. When confronted with this record, Diroff testified that Smouthers had previously worked as a body repair technician at another dealership, was a state-certified technician and he had seen Smouthers' certificate. The Court finds that the great weight of the credible evidence suggests that Defen-

dant's agents at least *thought* all of its body shop technicians were licensed, and would not have risked losing the dealership's license by knowingly employing Plaintiff or any other unlicensed person to perform work reserved by law to licensed employees. Smouthers, moreover, had not been hired on the commission basis that Plaintiff demands.

Plaintiff's position is discredited by the fact that, if he had indeed been hired by the Defendant Krug on the terms he claims, here, he would have been the highest paid employee at the establishment. The evidence of record demonstrates that Plaintiff earned approximately $2,268.55, in addition to $88.45 which he identifies as a bonus, or $2,357.00 in overall earnings from July 29, 1991 to the date of his discharge on October 2, 1991. This figure, with the exception of the $88.45 bonus, represents work Plaintiff performed assisting body shop technicians and performing non-collision type work routinely handled by body shop helpers and assemblers.

However, Plaintiff claims that because Defendant instituted a special incentive program for him, he is entitled to commissions, *in addition to* his hourly wage. As part of this program, Plaintiff states that, like commissioned employees, he generated time slips. On the basis of recorded work, therefore, he demands a commission from the $4,558.30 of "independent" work he performed as represented on his time slips, which at the 47% rate would amount to $2,142.40, as well as the $2268.45 he earned at the hourly wage. This Court cannot credit Plaintiff's contention that he is entitled to both an hourly wage and a commission as this would mean that Plaintiff, unlike any other Krug employee, would be receiving two forms of compensation for the same work. His claim is that Defendant discriminatorily withheld his commission to pay his hourly rate.

It appears that Plaintiff did not fully comprehend Defendant's compensation scheme. Indeed, Defendant's Production Manager, Robert Elliott, testified that in his opinion, Plaintiff never fully understood it. Part of his confusion developed from an incentive plan which was, in fact, undertaken for his benefit. Body Shop Manager Diroff testified that, due to Plaintiff's continual requests for a pay increase, an incentive program was designed through which Plaintiff could earn a 47% commission for all independent work which he performed *beyond the first $600 billable to a customer.* This incentive program commenced on September 1, 1991, and Diroff personally kept time slips monitoring Plaintiff's work. If Plaintiff performed independent work beyond the first $600 billable to customers, Diroff notified the payroll department and Plaintiff would be paid a 47% commission on that work. Diroff further testified that this $600 figure was not an arbitrary figure but was the baseline figure which he had calculated would cover the $6.00 hourly wage that Plaintiff was already paid. According to Diroff's characterization of the program, the $88.45 bonus to which Plaintiff refers, was actually the 47% commission compensation for the incentive program from the one week during which Plaintiff actually performed more than $600 worth of independent work, payable by customers. Prior to commencement of the incentive plan, Diroff generated time slips on Plaintiff's work in order to ascertain the level at which incentive pay could economically be awarded.

Plaintiff claims that Defendant owes him $2,142.40 in commissions in addition to the hourly wage paid because Diroff kept time slips on his work, whereas none were made for his hourly paid predecessor. However, it is apparent that the time slips were kept on Plaintiff's work only for accounting purposes, and this Court credits Diroff's testimony that slips were necessary to compare Plaintiff's hourly earnings to work produced, during the period that the incentive plan was under consideration.

Plaintiff's argument is that Defendant wrongfully used his *commission* revenue to pay him his *hourly* wage, although he is entitled to both, and that this alleged practice was motivated by racial animus. In light of the evidence of record, it is clear that awarding Plaintiff both the commission and the hourly wage would have amounted to double compensation, and that the claim is based on misunderstanding. Moreover, no employee, whether white or black, had ever

been paid both wages and commissions, before.

This Court finds no evidence of racial animus in any of the circumstances surrounding Defendant's implementation of the program. Thus, on the claim that he was disparately treated in terms of employment, due to his race, Plaintiff's complaint must be dismissed.

■ Next, Plaintiff claims that his discharge for insubordination was racially discriminatory. Plaintiff further claims that in the course of the confrontation leading to the discharge, Diroff displayed racial animus in his use of a racial epithet. This confrontation resulted when Plaintiff asked Production Manager Robert Elliott for his time slips, and Elliott made copies of Plaintiff's time slips for him. Plaintiff then demanded the originals of his slips from Mr. Diroff's office.

Elliott testified that he attempted to return the original time slips to Diroff's desk drawer where they were kept, but Plaintiff snatched them, and that Diroff also then became involved. In Elliott's presence, with all three in Diroff's office, Plaintiff and Diroff became involved in snatching the time slips from each other, and Plaintiff either accidentally or intentionally undisputedly pushed Diroff aside, over, or into a chair.

Diroff testified that he informed Plaintiff that he was "all done", or discharged, and immediately filled out a company verbal order form stating that Plaintiff had been terminated for insubordination. Plaintiff's claim that his discharge was race-based hinges upon his testimony that Diroff stated, during this final argument, that "you niggers have to learn you must crawl before you can walk." Diroff emphatically denies making any such statement, and Elliott who testified that the two were talking loudly, corroborates Diroff's denial.

This allegation of such a statement of pure racial animus being made by a supervisory agent of the Defendant has been carefully examined. It was first mentioned when Defendant moved for summary judgment shortly before trial in this case, and was the basis of this Court's denial of that motion. Having heard all of the testimony in this case, however, this Court is now satisfied that the statement was not made. In explaining why he had never mentioned such a statement before, Plaintiff testified that he had informed his investigator at the Equal Employment Opportunity Commission ("EEOC"), Linda Sankovich, of the statement, but that she refused to include it in his interview record or charge because it was "hearsay".

However, at trial, Defendant produced the deposition of EEOC investigator Sankovich who, as discussed above, was unavailable to testify, which supports the contention that the statement was not made. In her deposition, Sankovich denied ever having heard from Plaintiff an allegation that Diroff made the aforementioned racist statement, and further stated that she would most certainly have recorded such a significant accusation if she had heard it. It is also noteworthy that the pleadings filed by Plaintiff in this case, with the exception of his trial brief, fail to mention the alleged statement. The statement is the only evidence of Defendant's racial animus that Plaintiff offers in this case. Accordingly, in light of the aforementioned, this Court cannot accept Plaintiff's trial testimony concerning the alleged racial statement as credible.

■ Finally, Plaintiff claims that the events surrounding his return for his last paycheck, two weeks after his discharge, are also evidence of race discrimination. It appears to the Court that race may have been a factor in one of Defendant's employees' decision to call the Dearborn police when Plaintiff arrived at the body shop to request his final paycheck, although there had, after all, been a physical altercation at the time of his termination. Briefly, Plaintiff, accompanied by his cousin, William Freshly, arrived at the body shop to claim his final paycheck, but was told that the check was not there. When Plaintiff decided to remain at the body shop and wait for Diroff, who was out to lunch, it appears that one of Defendant's employees called the Dearborn police. On arrival, the police informed Plaintiff they had been advised of an African American male at this location with a gun, searched him, and found no weapon. Plaintiff's cousin, who had remained in the car, was searched as well.

Plaintiff believes that the call made by an unidentified employee to the Dearborn police was done to humiliate him and is further evidence of race discrimination. After this incident, the police, acting as a liaison between Plaintiff and Defendant's employees, forbade Plaintiff from returning to the Defendant's premises, and informed Plaintiff that his check was at the main office, located a few miles away. When Plaintiff arrived at the main office, he was informed that Diroff had his final paycheck. Determined to obtain his final paycheck, Plaintiff then returned to the forbidden body shop, and the police were summoned a second time. Plaintiff told the police that all he wanted was his final pay, Diroff handed the check over to the Dearborn police, and they in turn handed it to Plaintiff, on the street.

Although these events were unfortunate, and race may have been a factor in the decision to call the police twice, these events are not evidence of race discrimination in terms of Plaintiff's employment or discharge. There is no evidence as to who called the police or that such a call was without some legitimate basis, in view of the past physical altercation.

Finally, Defendant's claim that Plaintiff's final paycheck was being held because Plaintiff was still in possession of tools previously checked out to him. Plaintiff denies having been issued any such tools, and testified that he had his own. No documentation was presented demonstrating that Plaintiff received tools from the Defendant. Accordingly, Defendant's claim for $750 for the tools must be denied.

Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over the instant lawsuit, after dismissal of Plaintiff's state-based Elliott–Larsen claim.

Section 703(a)(1) of Title VII provides in its pertinent part:

It shall be an unlawful practice for an employer—

"(1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employ-

ment, because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1)

■ Plaintiff bears the burden of establishing, by a preponderance of the evidence, a *prima facie* case of a racially discriminatory discharge pursuant to Section 703(a)(1) of Title VII. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Leonard v. City of Frankfort Electric and Water Plant Bd.,* 752 F.2d 189, 193 (6th Cir.1985). To satisfy the minimal requirements for establishing such a *prima facie* case, as defined in *McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824, Plaintiff must show that: (1) he is a member of a protected class; (2) he was discharged; (3) he was treated differently than a similarly situated white; and, (4) his employer solicited applicants for the position from which he was discharged. *Potter v. Goodwill Industries,* 518 F.2d 864, 865 (6th Cir.1975).

■ If the Plaintiff succeeds in establishing a *prima facie* case, a presumption is created that the employer unlawfully discriminated against the employee. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). Further, when a *prima facie* case is established, the burden of production, but not proof, shifts to the Defendant who is only required to "articulate a legitimate, non-discriminatory reason" for the alleged adverse employment action. *Id.* at 254–255, 101 S.Ct. at 1094. In short, through the introduction of admissible evidence, the defendant must show legitimate reasons for its actions, which if credited by the trier of fact, would support a finding that there was no unlawful discrimination causing the discharge. *Id.* at 254–55, 101 S.Ct. at 1094–95.

■ Plaintiff then is required to prove that the reasons articulated by the Defendant are a pretext for discrimination, that the reasons are false, and that discrimination was the real reason for the employment termination. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, —— – ——, 113 S.Ct. 2742, 2751–2752, 125 L.Ed.2d 407, 421–422 (1993); *see also Burdine, supra,* 450 U.S. at 253, 254–56, 101 S.Ct. at 1093, 1094–95. More-

over, in a disparate treatment case, such as the one at bar, the district court must "decide the ultimate factual question of whether defendant intentionally discriminated against the plaintiff." *St. Mary's Honor Center, supra*, —— U.S. at ——, 113 S.Ct. at 2753, 125 L.Ed.2d at 424, *quoting U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). In so deciding, it is not enough to disbelieve the reasons proffered by the employer, rather the factfinder must believe the plaintiff's explanation of intentional discrimination. *Id.*, —— U.S. at ——, 113 S.Ct. at 2753, 125 L.Ed.2d at 424. Thus, although *McDonnell Douglas* and its progeny shift the burden of production to the Defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at ——, 113 S.Ct. at 2747, 125 L.Ed.2d at 416; *Galbraith v. Northern Telecom*, 944 F.2d 275, 279 (6th Cir.1991); *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 92–93 (6th Cir.1982).

In the case at bar, it cannot be said that Plaintiff has established a *prima facie* case under Title VII, as he has not met the crucial requirement of establishing that he was treated differently than any similarly situated white individuals. This Court finds that the credible evidence of record does not support Plaintiff's claim that he was compensated in a manner different or less favorable than any similarly situated white employees. At the initial stages of his employment, Plaintiff was compensated on an hourly basis, as were all body shop helpers and assemblers before and after him. Moreover, Plaintiff was compensated at a hourly wage higher than that of the white assembler that he was hired to replace. He was not a state-certified technician, undisputedly. As for the modified pay plan, which Plaintiff claims was discriminatory, it is clear that the program was implemented in good faith by the Defendant to accommodate Plaintiffs' repeated requests for the opportunity to earn increased income. Thus, implemented at a time when Plaintiff was the only body shop helper employed by the Defendant, the incentive program allowed him to earn additional income,

and this did not function in a discriminatory fashion or even to Plaintiff's disadvantage.

■ Moreover, Plaintiff's contention that his time slips were handled by Diroff personally, and not the payroll department, is not evidence of disparate treatment. As aforementioned, Diroff kept Plaintiff's time slips to monitor the profitability of the incentive program, and Plaintiff's progress. This Court credits Diroff's testimony regarding the implementation of the incentive program, and finds that his monitoring of Plaintiff's time slips was a legitimate business practice.

Finally, Plaintiff has presented no credible evidence concerning Defendant's alleged intentional discrimination as the motivation behind his ultimate discharge. This Court credits Diroff's testimony that Plaintiff was discharged for insubordination, a legitimate, non-discriminatory reason for the adverse employment action. Although Plaintiff claims that a racist statement was made in the course of the altercation that caused Plaintiff's discharge, this Court finds that the alleged statement was not made. Diroff testified that he did not make the statement, Elliott corroborated Diroff's testimony, and Linda Sankovich of the EEOC, testified at a deposition, that Plaintiff did not report the statement being made when she interviewed him. It was included in none of his pleadings until Defendant filed a motion for summary judgment, here. In short, race played no factor in Plaintiff's discharge, and this court credits the testimony that Plaintiff was terminated for insubordination.

Further, even if Plaintiff had established a *prima facie* case, Plaintiff still would not have prevailed on his Title VII disparate treatment claim. As aforementioned, it is clear that Defendant's agent Diroff developed the incentive program to benefit the Plaintiff. Moreover, Diroff's practice of keeping Plaintiff's time slips and personally monitoring the progress of the modified pay plan is not evidence of disparate treatment, as Plaintiff claims. As an unlicensed body shop helper, Plaintiff was not similarly situated to licensed body shop technicians, the latter being commissioned employees whose

time slips were handled by Defendant's payroll department.

Plaintiff has not presented a viable claim under Title VII, as the great weight of the credible evidence does not support his contention that Defendant implemented a racially discriminatory incentive plan or that he was discharged for prohibited discriminatory reasons. Plaintiff has failed to show that he was treated differently than similarly situated white employees. He presented no credible evidence regarding Defendant's alleged intentional discrimination. Finally, Defendant has presented a legitimate business reason for its special monitoring of Plaintiff's time slips, and a legitimate non-discriminatory reason for Plaintiff's discharge.

Accordingly,

Plaintiff Williams' claim of disparate treatment and for wrongful discriminatory discharge against the Defendant Krug–Lincoln–Mercury under § 703(a)(1) of Title VII is DISMISSED, as Plaintiff has not made out a case of disparate treatment, intentional discrimination or wrongful discriminatory discharge.

Further, Defendants' counterclaim for $750 as compensation for Defendant's tools, which it claims Plaintiff did not return, is also DISMISSED, as there is no evidence that Plaintiff received any tools from the Defendant.

IT IS SO ORDERED.